# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Shannan G.,

        Plaintiff,

v.

Kilolo Kijakazi, Acting Commissioner of
Social Security,

        Defendant.

Case No. 22-cv-01895 (NEB/ECW)

**REPORT AND RECOMMENDATION**

---

This matter is before the Court on Plaintiff Shannan G.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 18) and Defendant Acting Commissioner of Social Security Kilolo Kijakazi's ("Defendant" or "the Commissioner") Motion for Summary Judgment (Dkt. 21). Plaintiff filed this case seeking judicial review of a final decision by Defendant denying her application for disability insurance benefits. This case has been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons stated below, the Court recommends that Plaintiff's Motion be granted in part, Defendant's Motion be denied, and that this case be remanded to the Commissioner consistent with this Report and Recommendation.

## I.    BACKGROUND

On February 3, 2020, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, alleging disability as of July 1, 2016.[1]  (R. 176.) Plaintiff later amended her alleged onset date to April 30, 2020, during her administrative hearing.  (R. 11.)  Plaintiff's date of last insured is December 31, 2021.  (R. 185.)  Her application was denied initially and on reconsideration.  (R. 90, 98.)  Plaintiff filed a written request for a hearing, and on July 9, 2021, Plaintiff appeared and testified at a hearing before Administrative Law Judge Corey Ayling ("the ALJ").  (R. 32.)

The ALJ issued an unfavorable decision on April 8, 2019, finding that Plaintiff was not disabled.  (R. 11-26.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[2] the ALJ first determined at step one that Plaintiff had not engaged in

---

[1]    The Social Security Administrative Record ("R.") is available at Docket Entry 15.

[2]    The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

substantial gainful activity during the period from the amended alleged onset date of April 30, 2020.  (R. 13.)

At step two, the ALJ determined that Plaintiff had the following medically determinable impairments: mild lumbar degenerative disc disease, cervical and lumbar spondylosis without myelopathy or radiculopathy, hypothyroidism, chronic pain, and peripheral neuropathy.  (R. 13.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CPR Part 404, Subpart P, Appendix 1.  (R. 15.)

The ALJ then assessed Plaintiff with the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except with the following limitations: occasional climbing of ramps and stairs; no climbing ladders, ropes, or scaffolds; occasional balancing as that term is defined in the Selected Characteristics of Occupations; occasional stooping, kneeling, crouching, and crawling; no work at unprotected heights; no work near moving mechanical parts, the kind of moving machinery such that the loss of balance in proximity of that machinery would pose a severe safety hazard to life or limb; and no work operation of a motor vehicle.

(R. 17.)

The ALJ concluded, based on the above RFC and the testimony of the vocational expert ("VE"), that Plaintiff could not perform her past relevant work.  (R. 24.)

The ALJ determined, based on the VE's testimony, that given Plaintiff's age, education, work experience, and RFC, there were other jobs that existed in significant

numbers in the national economy that she could perform, including as a: Telephone

Solicitor, Dictionary of Occupational Titles ("DOT") 299.357-014, semi-skilled

sedentary work, SVP 3, with approximately 64,000 positions in the national economy;

and Telecommunicator, DOT 379.362-018, skilled sedentary work, SVP 5, with

approximately 28,000 positions in the national economy.  (R. 25.)  In addition, the ALJ,

again based on the testimony of the VE, concluded that there were a number of unskilled

positions that Plaintiff could perform, including: Data Entry Clerk, DOT 203.582-054,

unskilled sedentary work, SVP 2, with approximately 42,000 positions in the national

economy.  (R. 25.)

Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 26.)  Plaintiff requested

review of the decision and the Appeals Council denied Plaintiff's request for review,

which made the ALJ's decision the final decision of the Commissioner.  (R. 1-4.)

Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

The Court has reviewed the entire administrative record, giving particular

attention to the facts and records cited by the parties.  The Court will recount the facts of

record only to the extent they are helpful for context or necessary for resolution of the

specific issues presented in the parties' motions.

## II.    RELEVANT RECORD

On May 11, 2020, Plaintiff was seen for neck, lower back, and bilateral lower

extremity pain. (R. 1552, 2395.)  Plaintiff rated her pain at 6/10 and localized it to her

lower back.  (R. 1552.)  It was noted that she had undergone radiofrequency ablation

("RFA") that had provided her with 100% relief for seven months and 90% ongoing

relief.  (*Id.*; R. 1565.)  Plaintiff reported that she had gone to the emergency room on February 10, 2020, where she received Toradol[3] injections.  (R. 1552.)  Plaintiff reported an increase in occurrence and frequency of numbness in her lower extremities (without weakness), shock-like pain her lower back, and tightness at the bottom of her rib cage. (*Id.*)  Plaintiff was taking Amitriptyline[4] for pain with moderate relief that was not long lasting.  (R. 1553.)  Plaintiff's musculoskeletal examination showed a normal gait and station, no pain with flexion or extension as to the lumber spine, and normal bilateral lower extremity strength.  (R. 1553.)  The assessment for Plaintiff was chronic pain, spondylosis[5] in the lumbosacral region, and spondylosis in the cervical region both without myelopathy or radiculopathy.  (R. 1553.)  A lumbar MRI was ordered based on her new symptoms and Plaintiff was started on gabapentin[6] for the spondylosis.

A May 26, 2020 MRI for Plaintiff's lumbar spine was unremarkable.  (R. 1581.)

On June 7, 2020, Plaintiff presented to the emergency department with bilateral leg pain and numbness and was noted to have a history of chronic back pain and

---

[3]    Toradol is a medication used to relieve moderately severe pain and belongs to the group of medicines called nonsteroidal anti-inflammatory drugs.  *See* https://www.mayoclinic.org /drugs-supplements/ketorolac-oral-route-injection-route/description/drg-20066882 (last visited June 26, 2023).

[4]    Amitriptyline is prescribed for used for a variety of different uses, including, but not limited to, depression and for pain relief.  THE PILL BOOK, 1180 (15th ed. 2012).

[5]    Spondylosis: "Ankylosis of the vertebra; often applied nonspecifically to any lesion of the spin of a degenerative nature."  STEDMAN'S MEDICAL DICTIONARY, 1813 (28th ed. 2006).

[6]    Gabapentin is prescribed for pain relief. THE PILL BOOK, 1142 (15th ed. 2012).

fibromyalgia.  (R. 1706.)  Plaintiff endorsed a burning pain and numbness radiating from her lower back to her bilateral hips and legs, all the way down to her toes.  (R. 1706.)  Plaintiff could not even ambulate with the use of a cane.  (R. 1706.)  It was noted that her MRI results were normal, and that her symptoms were consistent with sciatica.[7]  (R. 1707.)

On June 9, 2020, state agency physician George Erhard, M.D., reviewed the record regarding Plaintiff's physical condition (R. 62-64).  Based on his review of the record, Dr. Erhard found Plaintiff could meet the demands of light work, with some minor postural and environmental limitations.  (R. 62-64.)  Plaintiff had no manipulative limitations.  (R. 63.)

On June 10, 2020, Plaintiff was seen for her lower back and lower extremity pain.  (R. 2288, 2391.)  It was noted that she went to the hospital for lower extremity symptoms and was informed that she had bilateral sciatica.  (R. 2288.)  Plaintiff demonstrated an antalgic gait, sat comfortably, and required a cane for ambulation.  (R. 2289.)  She was observed twice walking down the hall, likely without her knowledge, she ambulated extremely slowly with a cane, she did not seem off-balance, but her head did "shake" during ambulation.  (R. 2289.)  Plaintiff reported diminished feeling in lower extremities with light touch sensation, but did have 4/5 strength throughout without any focal weakness.  (R. 2289.)

---

[7]     Sciatica: Pain in the lower back and hip radiating down the back of the thigh into the leg, initially attributed to nerve dysfunction, . . . but now known to usually be due to herniated lumber disk compressing a nerve root. . . ."  STEDMAN'S MEDICAL DICTIONARY, 1731 (28th ed. 2006).

Plaintiff was hospitalized from June 14, 2020 through June 19, 2020 for worsening bilateral numbness, tingling, and weakness in her lower extremities.  (R. 1623, 1637-38, 1644, 1697.)  Plaintiff reported not being able to walk for two weeks.  (R. 1638.) Plaintiff had reproducible pain in the lower lumbar, she was only minimally able to move her toes, she was unable to lift her legs, she felt pressure with touching of the feet, and did not appreciate sharp stimuli.  (R. 1640.)  Upper extremities were normal.  (R. 1640.) No neurological cause was found.  (R. 1623, 1640-61, 1697.)  According to Plaintiff, she first started to develop bilateral leg numbness and diffuse burning pain on May 10, 2020. (R. 1638.)

On June 29, 2020, Plaintiff reported no improvement and that her symptoms had worsened.  (R. 1624.)  Plaintiff continued to have difficulty at times walking and standing due to weakness and neuropathy, was in a wheelchair during her appointment, and needed help with transfers.  (R. 1624.)  Her exam showed some weakness in both lower legs, that she was unable to dorsi flex both feet, and that her sensation was intact with light touch as to both legs.  (R. 1625.)

At her June 29, 2020 occupational therapy session with occupational therapist Kristin Nierengarten ("Nierengarten"), it was noted that Plaintiff had a history of bilateral lower extremity weakness with hospital admission for multiple comorbidities including fibromyalgia and chronic pain.  (R. 1631.)  Neurology had done an extensive workup including EMG, spinal imaging, and repetitive exams, but no obvious neurological cause was found.  (R. 1631.)  Nierengarten's examination showed that Plaintiff had normal upper extremity strength, range of motion, and good coordination.  (R. 1631, 1634.)

Plaintiff had normal posture sitting and standing.  (R. 1634.)  Plaintiff was non-ambulatory, needing to use a wheelchair to ambulate and a walker (or husband) for transfers.  (R. 1633-34.)  Plaintiff's goal was to be able to walk, sit-stand transfer more independently, complete meal preparation tasks, and improve her independence with childcaring tasks.  (R. 1634-35.)  Plaintiff reported that she was very limited in her ability to complete her own personal cares, household management activities, and care for her children due to her inability to ambulate safely.  (R. 1631.)  The therapist did note that while Plaintiff claimed she could not walk and needed to be carried by her husband, she was able to walk using bilateral ankle-foot orthosis ("AFO") braces and a walker during the physical therapy session just prior to the occupational therapy session.  (R. 1631.)

On July 7, 2020, Plaintiff reported for a physical therapy session, and it was noted that her strength had decreased and she had a harder time picking her feet up.  (R. 1621.)  Plaintiff claimed that her weakness often worsened throughout the day and, as a result, she had experienced multiple near falls.  (R. 1621.)  On July 13, 2020, Plaintiff stated that she had been sore for multiple days following her last session and had skipped her home exercises.  (R. 1615.)  The goal was to allow her to ambulate with an assistive device.  (R. 1616.)  On July 16, 2020, it was noted that Plaintiff had been having a lot of nerve pain and felt like she was constantly sore and could not recover following sessions.  (R. 1612.)  On July 22, 2020, Plaintiff reported experiencing more pain and leg weakness and more swelling in addition to a very strong clonus[8] when attempting to climb stairs to the

---

[8]    Clonus involves the rapid contractions and relaxations of a muscle.  *See* STEDMAN'S MEDICAL DICTIONARY, 393 (28th ed. 2006).

point that she needed help from her husband.  (R. 1606.)  Plaintiff claimed that she was too fatigued to do her at-home exercises most days.  (R. 1606.)  She had excellent upper body strength, so she did well using a podium/Eva type walker for a smoother gait pattern.  (R. 1607.)

During a July 27, 2020 therapy session, Plaintiff reported high levels of pain in her legs and back.  (R. 1602.)  Plaintiff underwent a trial of a TENS unit during the session, but she did not report any change.  (R. 1602.)  She did have improvement in her lower extremity edema using ACE wraps in session and some massage/exercises, and she did well using the platform walker.  (R. 1602.)  Plaintiff reported being too fatigued most days to do her home exercises.  (R. 1602.)  Her goal was to be able to walk again.  (R. 1604.)

On August 10, 2020, Plaintiff reported during physical therapy that she felt much worse over the previous week without therapy sessions, was stiffer, and experienced more pain.  (R. 1887.)  She showed an improvement with weight shifting while standing, but needed occasional balance checks using a rail.  (R. 1888.)

At her August 12, 2020 physical therapy appointment, Plaintiff complained of increased pain from the previous night due to swelling.  (R 1885.)  Plaintiff was told to present to the emergency department if the pain became worse.  (R. 1886.)

On August 12, 2020, Plaintiff presented to the emergency department concerning her leg pain, weakness, and edema.  (R. 1590.)  It was noted that Plaintiff had been experiencing progressive back pain, leg pain, neuropathy, and lower extremity weakness for over two months.  (R. 1591.)  Despite extensive physical therapy, Plaintiff's loss of

strength and sensation had progressed to the point where she was wheelchair bound and did not respond to painful stimuli. (R. 1591.) She had been seen by two neurologists, had MRI imaging of the back, neck and brain, as well as undergone a lumbar puncture, all of which found no known cause for her weakness. (R. 1591.) Plaintiff was noted to be positive for back pain, myalgias, weakness, and numbness. (R. 1592.) Her examination showed: that her neck was atraumatic; no tenderness in her back; no obvious deformities; normal strength and sensation from the waist up; firing of muscles of bilateral lower extremity with toe movement; severely diminished strength in hips, ankles, and knees; and sensation present but diminished without pain, without patellar reflex bilaterally. (R. 1592.) The diagnosis was weakness of both lower extremities and a sensation of cold in the leg. (R. 1593.)

On August 27, 2020, Plaintiff reported increasing leg heaviness and fatigue and stated that she had begun losing temperature sensation in her lower extremities. (R. 1867-68.) Plaintiff noted that she had not taken her Amitriptyline. (R. 1867.)

On September 22, 2020, Plaintiff was seen for her lower back and lower extremity back pain. (R. 2386.) Plaintiff noted that the Gabapentin had provided with her pain relief initially, but symptoms had increased on her lower extremities and was seeking an increase in dosage. (R. 2386.) Plaintiff displayed an antalgic gait, she sat comfortably, and needed a wheelchair for ambulation. (R. 2387.) Plaintiff reported improvement to her lower extremities with the use of a TENS device, with improvement in nerve pain for several days after use. (R. 1860.)

A September 23, 2020 nerve conduction and EMG was performed on Plaintiff showing electrophysiologic evidence suggestive of a left-sided L5 radiculopathy, with a lesion more distally in the lumbosacral plexus or sciatic nerve not excluded. (R. 1919-20, 1924.)

During a September 29, 2020 physical therapy session, Plaintiff claimed that she had no change to her pain level in response to the increase in Gabapentin, with a pain level of 8 out of 10 located in her legs and back. (R. 1856-57.) She was able to ambulate 105 feet using a rolling walker and was fatigued at the end with her knee buckling at 70 feet. (R. 1857.) It was recommended that Plaintiff use her crutches to ambulate into her bathroom at home. (R. 1857.) It appeared that she was weaker at the therapy session but noted that she had done a lot over the previous days. (R. 1857.) The goal for Plaintiff was to walk independently again, which was to be measured by Plaintiff being able to walk 150 feet with appropriate assistive devices. (R. 1857-58.)

During an October 13, 2020 physical therapy session, Plaintiff complained of a rough two days with bone pain drilling into her shin that lasted over 30 minutes. (R. 1840.) She reported pain in her back and thighs. (R. 1840.) Plaintiff's balance showed improvement. (R. 1841.)

On October 14, 2020, Plaintiff reported to her doctor that her strength was stable, she was able to walk with crutches, and felt as though her mobility was a bit better. (R. 1915-16.) The degree of numbness in her lower limbs remained unchanged. (R. 1916.) Pain was infrequent, three to four times per week lasting five minutes. (R. 1916.) Plaintiff's MRIs showed no finding to account for Plaintiff's symptoms. (R. 1916, 1924.)

An EMG showed modest denervation changes in lower limb muscles, but not of a degree that explained the severity of her weakness, and no electrophysiologic evidence of a demyelinating neuropathy. (R. 1918.) Her upper extremity motor examination was normal. (R. 1917.) She showed no tremor or ataxia. (R. 1917.) The sensory exam showed that sensation to pin and temperature was reduced below the knee, becoming denser in the feet. (R. 1917.) Sensation to vibration was mildly reduced at the toes. (R. 1917.) Plaintiff was also able to stand unassisted pushing off a wheelchair, required assistance to walk, was unable to fully lift her feet off the ground with walking, and was able to lift her heel but her toe would drag on the ground. (R. 1917.)

On October 20, 2020, Plaintiff was seen for her lower back and lower extremity pain. (R. 2279, 2382.) Plaintiff rated her pain a 9 out of 10. (R. 2279.) Plaintiff was seeking medical cannabis for pain relief. (R. 2280.) Plaintiff demonstrated an antalgic gait, sat comfortably, and required a wheelchair for ambulation. (R. 2280.) Plaintiff was to continue on Gabapentin for her pain and to possibly consider a neuropathic medication if the Gabapentin was unhelpful.

During an October 8, 2020 occupational therapy session with Nierengarten, it was noted that an EMG showed left sided radiculopathy and that recent paraparesis[9] had caused the recent changes in functioning. (R. 1843.) Plaintiff represented that she was able to feed, bathe (with help from her husband as to transfer), groom, dress herself, and ambulate from room to room with a wheelchair. (R. 1844.) Her pain was not improved

---

[9] Paraparesis: "Weakness affecting the lower extremities." STEDMAN'S MEDICAL DICTIONARY, 1421 (28th ed. 2006).

on medication with deep bone pain in the shins.  (R. 1843.)  Sensation, coordination, and

strength was limited as to Plaintiff's lower extremities on examination.  (R. 1845.)

Plaintiff was able to walk 15 feet using assistive devices.  (R. 1846.)  Her gait showed

heavy leaning forward using locked brakes, difficulty advancing lower extremities and

"dragging" on floor resulting in a very short step length, and using her upper extremities

and trunk to move lower extremities due to weakness.  (R. 1846.)  Plaintiff could walk

into her bathroom using crutches, but was otherwise wheelchair bound.  (R. 1847.)

Nierengarten's assessment for Plaintiff was as follows:

> Pt is a 34 yo female with hx of fibromyalgia, bilateral LE weakness and pain that has noted to have a progressive decline in LE functioning since April 2020. She has consulted with (2) neurologists, Mayo clinic declined her case, she has had extensive medical testing and scans with (2) more recent EMGs. She has quite severe bilateral paraparesis and EMG found (L) sided L5 radiculopathy. Prior to April, she was independent with self-cares, took care of her kids and had no mobility deficits. Pt now is only able to take 5- 6 steps with crutches into her bathroom otherwise is fully wheelchair dependent. She is having radiating pain down her back, bilateral LE swelling and diminishing strength. Pt is not safe to ambulate. Pt is in a standard manual wheelchair that is too wide for her home and she is not able to propel. She does not have LE function for foot propulsion thus relies heavily on arms. Pt is interested in the lightest weight chair possible so she can maneuver around her home and take care of her (2) young children.

(R. 1847.)

During an October 27, 2020 occupational therapy session with Nierengarten, it

was noted that Plaintiff had a history of fibromyalgia, bilateral lower extremity weakness

and pain, and had suffered a progressive decline in functioning since April 2020.  (R.

1833.)  Plaintiff had consulted with two neurologists, the Mayo Clinic declined her case,

and she had undergone extensive medical testing and scans.  (R. 1833.)  Plaintiff had

severe bilateral paraparesis and an EMG found left-sided L5 radiculopathy. (R. 1833.) Prior to April 2020, Plaintiff was independent with self-cares, took care of her kids, and had no mobility deficits. (R. 1833.) Plaintiff needed help with transfers, was able to ambulate approximately 100 feet at therapy, but otherwise spent the majority of her time at home in her wheelchair. (R. 1833.) She was able to do some static standing but fatigued very quickly and noted knee buckling. (R. 1833.) Plaintiff required assistance to obtain food and was unable to effectively feed her children at times, but was able to use the walker to get into the refrigerator. (R. 1832.) Plaintiff also needed assistance from her spouse to lean on the bathroom counter so he could wash her face, needed help dressing herself, and needed some assistance otherwise using the bathroom. (R. 1832.) She could sit to vacuum, do dishes, and fold laundry, but found it difficult to put the clothing away. (R. 1833.) She could also do some light meal preparation while sitting in her wheelchair. (R. 1833.)

On November 4, 2020, Plaintiff underwent gait training with a treadmill using a harness while holding onto handles. (R. 1999.) Patient tolerated ambulation well and was able to occasionally get foot clearance of the treadmill. (R. 1999.) At times she had lateral sway needing the aid of the harness. (R. 1999.) Plaintiff was using the AFO brace and it was noted that her gait would benefit from a toe slider. (R. 1999.)

On November 6, 2020, state agency consultant Raymond Tervo, M.D., looked at Plaintiff's medical record on reconsideration. (R. 76-85). Dr. Tervo explained that Plaintiff's alleged symptoms were "partially consistent with the objective medical evidence" in the record, but that Plaintiff's claimed functional limitations were "more

severe and extensive than shown on physical examination, EMG or imaging." (R. 78-79). Dr. Tervo also found that Plaintiff alleged a worsening of symptoms since Dr. Erhard's review, including symptoms that left her in need of a wheelchair, but that the objective evidence was "not consistent with [that] level of impairment." (R. 81). According to Dr. Tervo, Plaintiff could: occasionally lift 20 pounds; frequently lift 10 pounds; stand or walk 6 hours in an 8-hour work day; sit for a total of 6 hours in an 8-hour work day; had an unlimited ability to lift and carry; could occasionally climb stairs and ladders/ropes/scaffolds; could occasionally balance, stoop, crouch and kneel; she had no manipulative limitations; and she had no environmental limitations, other than to avoid moderate exposure to hazards, such as machines and heights. (R. 82-84).

On November 10, 2020, Plaintiff reported starting new medication that had helped with her pain, and rated her pain 3 out of 10. (R. 2021.) Plaintiff ambulated about 104 feet at a time during therapy with the use of toe sliders, an AFO brace, a knee brace, and upper extremity support. (R. 2021.)

On November 12, 2020, Plaintiff was seen for a virtual visit to obtain a handicapped parking pass, where she represented that she had been doing physical therapy and occupational therapy two times per week. (R. 2032.) Plaintiff reported that her symptoms had not improved but had not worsened. (R. 2031.) She still needed to use crutches, a wheelchair, and help from others to get around and perform her daily activities. (R. 2032.) Plaintiff could walk but could not stand for long periods of time. (R. 2032.)

On November 13, 2020, Plaintiff noted that she experienced some bone pain, but took some of her medication and the pain went away.  (R. 2025-26.)

On November 18, 2020, Plaintiff was seen by neurologist Jeffery Allen, M.D.  (R. 2178.)  Overall, she felt that her weakness and numbness was stable.  (R. 2178.)  During physical therapy she walked using a walker.  (R. 2178.)  Plaintiff was able to stand unassisted at home and used crutches at times.  (R. 2178.)  She still required assistance with transfers but felt this was slightly improved.  (R. 2178.)  She had recently started medical cannabis, which helped with the pain.  (R. 2178.)  She felt the weakness in her legs was not limited due to pain and continued to have paresthesias essentially from her hips down to her toes, which was constant.  (R. 2178.)  It was noted that an October 6, 2020 MRI of Plaintiff's lower spine showed only mild degenerative changes, and no radiographic findings to explain her symptoms.  (R. 2178.)  There was no impingement of L5 nerve roots.  (R. 2178.)  There was mild bone marrow reconversion, nonspecific, which could have been age-related or could have represented underlying subtle hematologic disease.  (R. 2178.)  On October 6, 2020, a CT scan showed no lymphadenopathy, organomegaly, or masses detected in the chest, abdomen or pelvis.  (R. 2178.)  The motor examination showed that Plaintiff's neck and upper extremities were normal.  (R. 2180.)  Flexion and extension in the lower extremities showed power at 3 out of 5.  (R. 2180.)  Pin sensation was reduced below mid-calf becoming denser in the feet and vibration mildly reduced at the toes.  (R. 2180.)  She was able to stand unassisted pushing off a wheelchair, required assistance of one to walk, and was unable to fully lift her feet off the ground when walking.  (R. 2180.)  She was able to lift her heel, but her

toe would drag on the ground. (R. 2180.) She remained "quite functionally impaired, but there is some evidence of improvement on I-RODS and grip strength." (R. 2181.) Dr. Allen found that none of the testing and imaging could account for Plaintiff's symptoms. (R. 2181.) Post-infectious vasculopathy remained a possibility. (R. 2181.) Plaintiff started a three-month trial of 3 IV methylprednisolone (steroid) and with a reassessment set for 3 months to see if there was a clear benefit. (R. 2181.) Physical therapy was continued as well as the use of Gabapentin for pain. (R. 2181.)

On November 19, 2020, Plaintiff underwent physical therapy, where it was reported that Plaintiff had not performed her home exercise program. (R. 2043.)

On November 23, 2020, Plaintiff reported significant fatigue after being placed on a steroid with a new onset of swelling in the lower extremities. (R. 2047-48.) Plaintiff reported a significant reduction in pain with the use of medical cannabis. (R. 2048.)

Plaintiff was also seen on November 23, 2020 for her lower back and lower extremity pain. (R. 2275, 2378.) Plaintiff rated her pain 3 out of 10. (R. 2275.) She continued to centralize her worst pain to her lower back in addition to her bilateral lower extremities. (R. 2275, 2378.) Plaintiff also reported that her legs were completely numb with shooting pain, and that she also experienced numbness in her hands. (R. 2275.) In addition, Plaintiff claimed that her head shook when she tried to lift her feet up. (R. 2275.) Plaintiff's gait was poor and she moved around the exam room with difficulty, but she was moving all extremities spontaneously with no weakness. (R. 2276.) The diagnoses for Plaintiff was chronic pain and spondylosis. (R. 2276.)

On November 30, 2020, Plaintiff's occupational therapy sessions were suspended until her mobility improved. (R. 2061.) Nierengarten's functional assessment for Plaintiff was that she was ambulating approximately 100 feet with bilateral toe sliders and pelvic support in therapy, but otherwise spent the majority of her time in her wheelchair at home. (R. 2060.) She was able to do some static standing but fatigued very quickly and noted knee buckling. (R. 2060.) Plaintiff needed supervision with all self-cares, including moderate to maximum assistance for household daily activities and child rearing. (R. 2060.)

It was noted at physical therapy on November 30, 2020 that Plaintiff's progress was steady when using a "Lite Gait harness system," but limited by fatigue and she exhibited edema that was new based on the use of a new steroid. (R. 2063.)

On December 3, 2020, Plaintiff reported to physical therapy with a great deal of fatigue. (R. 2070.) Her leg swelling had improved. (R. 2070.) Plaintiff had not completed her home program. (R. 2070.) Plaintiff noted pain in her neck at a level of 2 out 10 at rest and 10 out of 10 with movement. (R. 2070.) She tolerated ambulation using assistive devices with a report of increased fatigue. (R. 2070-71.)

On December 7, 2020, Plaintiff reported to physical therapy, noting continued improvement with the swelling in her lower extremities. (R. 2074.) Plaintiff had not competed her home program. (R. 2074.) Plaintiff discussed functional activities that she would like to focus on over the next couple of visits, including getting up/down off the floor to play with her kids and getting into/out of tub shower. (R. 2074.) She had not

been able to get up/down off the floor since March 2020 and relied on her husband for assistance with lifting her legs into and out of a tub shower. (R. 2074.)

On December 9, 2020, Plaintiff had a normal brain MRI, and the MRI of her spine showed no abnormal enhancement, cord abnormality, spinal canal, or foraminal stenosis in cervical or thoracic spine. (R. 2181, 2183-87.)

During Plaintiff's December 10, 2020, therapy session it was noted that she was safely able to perform floor transfers independently at home and she could safely scoot up/down stairs, demonstrating good control and motor planning throughout. (R. 2078.) It was also noted that Plaintiff had not performed her home exercise program. (R. 2077.)

On December 14, 2020, Plaintiff reported that she was able to get down to the basement for the first time in six months. (R. 2080.) Plaintiff also reported that she had not performed her home exercise program. (R. 2080.)

On January 11, 2021, an order was put in for a new wheelchair, as Plaintiff's mobility limitation could not be resolved by use of fitted cane or walker. (R. 2121.)

During a February 16, 2021 therapy session, it was noted that Plaintiff had been on a month-long break due to the use of steroid treatment. (R. 2126.) Plaintiff reported mild lower extremity leg swelling, a new onset of thoracic spine pain, increased lower extremity weakness, and increased fatigue. (R. 2126.) Most of the pain was localized to her lower back. (R. 2126.) Plaintiff reported more difficulty with ambulation using crutches in and out of bathroom, relied more heavily on a manual wheelchair, and endorsed not using the stairs due to fatigue/weakness. (R. 2126.) Compared to the previous physical therapy session, it was noted that Plaintiff's lower extremity tests were

weaker with manual muscle testing, but functional lower extremity strength with a 30 second sit to/from stand test was actually improved.  (R. 2126.)  Balance remained stable/unchanged since October, and Plaintiff's gait was very slow, labored, and effortful with notable left lower extremity buckling and decreased toe clearance.  (R. 2126.)  The range of motion in Plaintiff's upper and lower extremities were within normal limits.  (R. 2128.)  Strength in her core and lower extremities were impaired on testing.  (R. 2129.)  As to her gait, Plaintiff was supervised; had difficulty advancing her lower extremities, with dragging on the floor; fatigue was evident, and her left knee buckled.  (R. 2130.)  She was able to stand independently from a sitting position using her hands, and had the ability to stand for two minutes with supervision.  (R. 2131.)  Plaintiff's goal was to be able to walk, and she was to participate in an aquatic therapy program and home exercise program.  (R. 2131.)

On February 17, 2021, Nierengarten filled out a physical medical source statement for Plaintiff.  Nierengarten opined that Plaintiff could occasionally (no more than 1/3 of an 8-hour day) lift and carry less than 10 pounds; frequently (1/3 to 2/3 of an 8-hour day) lift and carry less than ten pounds; had a maximum ability to stand and walk of less than 2 hours in an 8-hour workday; a maximum ability to sit with normal breaks for about 2 hours in an 8-hour workday; could sit for 45 minutes before needing to change position; and could not stand before changing position for any duration.  (R. 1989-90.)  Nierengarten also opined that Plaintiff needed to intermittently lie down during an 8-hour workday.  (R. 1990.)  The reason given for this need to lie down was Plaintiff's pain, weakness, and spasticity.  (R. 1990.)  Plaintiff also needed to elevate her feet/legs during

a work shift at a 90-degree hip flexion.  (R. 1990.)  The medical findings given for supporting all of these limitations included "ascending bilateral LE weakness, lumbosacral spondylosis, neuropathy, edema, [and] paraparesis."  (R. 1990.)

In addition, Nierengarten found that Plaintiff could occasionally twist, stoop, rotate her neck, and flex her neck and could never crouch, climb stairs, climb ladders, or perform repetitive feet controls.  (R. 1991.)  Plaintiff's reaching, handling, fingering, feeling, and push/pull were affected by her impairments.  (R. 1991.)  She could occasionally engage in gross and fine manipulation.  (R. 1991.)  These functions were affected by Plaintiff's paraparesis and weakness, and she had difficulty with strength and the ability to manipulate.  (R. 1991.)  The medical findings supporting these limitations were the same as above.  (R. 1991.)  Further, Plaintiff was to avoid all exposure to extreme cold or extreme heat; and avoid concentrated exposure to wetness, humidity, and fumes/dust.  (R. 1992.)

Nierengarten also noted that Plaintiff was dependent on a wheelchair and required extensive assistance for transfers; required lower extremity elevation; had paraparesis, making it difficult to coordinate her lower extremities; and her impairments or treatment would cause her to be absent from her work more than three times per month.  (R. 1992.)

According to Nierengarten, these limitations went to April of 2020, and she stated that she had been treating Plaintiff since June 2020.  (R. 1993.)

During the March 3, 2021 physical therapy session, it was noted that Plaintiff inconsistently performed her home exercise program.  (R. 2142.)

On March 8, 2021, Plaintiff reported some tingling in the right hand that had improved and that she had been inconsistent with her home exercise program. (R. 2152.) Plaintiff trialed both a "Toe off" and a "Walk on" carbon fiber AFO that day. (R. 2153.) She reported and demonstrated better toe clearance and heel strike with the Walk on, which is a posterior cuff around the calf, and was able to ambulate further. (R. 2153.)

On March 17, 2021, Plaintiff was seen for a neurology follow-up by Dr. Allen related to her bilateral limb weakness. (R. 2188.) Plaintiff had completed her steroid treatment a month earlier. (R. 2188.) Plaintiff believed that the steroid did not help with her symptoms. (R. 2188.) In February, she reported some new areas of pain in her back that crept up to the middle of her shoulder blades, and reported that her arms and hands were more uncomfortable and fatigued easily. (R. 2188.) Tasks like opening jars were harder and she continued to have intermittent paresthesias in her hands. (R. 2188.) Plaintiff sometimes woke with tingling in her fingers (all) and forearms. (R. 2188.) Paresthesias and numbness persisted in both legs below the hips, and she continued to feel weak in that area. (R. 2188.) Weakness in her legs was about the same. (R. 2188.) She could walk with a walker but spent most of her time in a wheelchair. (R. 2188.) The motor examination showed that Plaintiff had normal neck and upper extremity flexion and extension but reduced grip strength. (R. 2190-91.) Flexion and extension in the lower extremities showed decreased power. (R. 2190.) Pin sensation was reduced below mid-calf, becoming denser in the feet and vibration slightly reduced at the toes. (R. 2190.)

On March 24, 2021, Plaintiff was seen for neck, lower back, and lower extremity pain. (R. 2271, 2374.) Plaintiff claimed that her pain had gone further up her back, that her head shook when she tried to lift her feet, and that she had numbness in her hands that became worse over time. (R. 2271.) Plaintiff was taking Gabapentin, Amitriptyline, and Tizanidine[10], with some relief and no side effects. (R. 2271.) Medical cannabis had provided her with pain relief. (R. 2272.) It was noted that Plaintiff was overweight, was not in any acute distress, she sat comfortably, and needed a wheelchair to ambulate. (R. 2272.) The Gabapentin was to be tapered as it provided her with no relief. (R. 2273.)

On March 31, 2021, nerve conduction and EMG testing was normal and showed no evidence of a disorder of lower motor neurons. (R. 2192-93.) A suprasegmental (central) recruitment pattern was observed, which the doctor stated is not seen in lower motor neuron disorders, but rather indicated a limitation by pain, effort, or upper motor neuron disease. (R. 2193.)

During an April 4, 2021 physical therapy session, Plaintiff continued to struggle with intense fatigue, was able to walk over 6-inch hurdles when using parallel bars for support, but was slow in her movements. (R. 2236-37.) Plaintiff tended to lean to her right when walking and continued to drag her feet on ambulation. (R. 2237.) The physical therapist noted that Plaintiff's home exercise program completion was inconsistent. (R. 2236.)

---

[10] Tizanidine is a muscle relaxant that is prescribed for spastic muscle movements. THE PILL BOOK, 1146 (15th ed. 2012).

During the April 19, 2021 physical therapy session, it was noted that Plaintiff's speed and gait mechanics were better when using trekking poles and the therapist suggested that she obtain some for walking short distances at home.  (R. 2251.)  The physical therapist noted that Plaintiff's home exercise program completion was inconsistent.  (R. 2251.)

During her April 21 and 26, 2021, physical therapy sessions, Plaintiff engaged in robotic assisted gait training using a "Lokomat" with walking poles.  (R. 2293, 2302.)  Plaintiff's home exercise program completion was inconsistent.  (R. 2302.)  As to the April 26 session, Plaintiff was able to walk 130 feet down the hall with caregiver assistance, and demonstrated knee buckling and heavy reliance on her upper extremities.  (R. 2304.)

On April 27, 2021, Plaintiff was seen for leg pain and a spine intervention.  (R. 2268, 2371.)  Her examination showed that she was able to sit comfortably, and that she demonstrated normal coordination in her upper and lower extremities.  (R. 2268.)  Plaintiff was diagnosed with complex regional pain syndrome in her lower limbs.  (R. 2268.)

On April 27, 2021, Plaintiff was injected with a lumbar sympathetic block. (R. 2369.)

During her April 28, 2021 physical therapy session, Plaintiff was able to walk 240 feet in the hallway using trekking polls with caregiver assistance, and demonstrated knee buckling and heavy reliance on her upper extremities.  (R. 2313.)

On May 10, 2021, it was noted that Plaintiff would be undergoing a trial with a new bilateral hinged AFO brace, and the therapist anticipated that her primary gait deficits should be minimized with the AFOs, and they will enable her to make further progress with her functional mobility (with fatigue being less of a barrier).  (R. 2344.)

On May 6, 2021, Plaintiff was again injected with a lumbar sympathetic block. (R. 2264.)

At the July 9, 2021 hearing before the ALJ, Plaintiff testified that she recovered her ability to walk in the last month using AFO leg braces, which helped with picking up her full foot.  (R. 40.)  She asserted that she could walk with the braces (through her physical therapy), although she got tired very fast and was still working on her standing and walking.  (R. 40, 45.)  She could not walk when she did not have the AFO braces on. (R. 40.)  Plaintiff took her wheelchair with her all of the time.  (R. 43.)  While she could walk inside someone's house and sit down if she is tired, she would need the wheelchair to go to places like Costco.  (R. 43-44.)  Plaintiff was taking Gabapentin for her neuropathy, Amitriptyline to sleep, and medical cannabis for her pain.  (R. 42.)  Plaintiff noted that the numbness and shooting pain in her lower extremities was helped somewhat with the use of the Gabapentin.  (R. 43.)  Sitting was not a problem for Plaintiff and she stated that she does get up and does not really sit too much during the day.  (R. 44.)  She did claim that some days sitting was very uncomfortable, but she had days where she could sit for three hours in her chair.  (R. 44-45.)  Plaintiff noted that she was going be having a spinal cord stimulator implanted due to increasing back pain.  (R. 47.)

On July 12, 2021, Plaintiff had a trial with a Medtronic spinal cord stimulator,

which provided her 50% relief to her low back symptoms and 70% pain relief to her lower extremities, bilaterally. (R. 2357-58, 2360.) Plaintiff was mostly wheelchair bound, but since the trial, was able to get up and ambulate. (R. 2357.) A stimulator was ordered for Plaintiff and implanted on September 14, 2021. (R. 2354.) On September 21, 2021, the device was activated. (R. 2352.)

### III.   LEGAL STANDARD

Judicial review of an ALJ's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's decision results from an error in law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018). As defined by the Supreme Court:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

"[T]his court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (cleaned up). "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (cleaned up). "In other words, if it is possible to

26

reach two inconsistent positions from the evidence, and one of those positions is that of the [ALJ], the Court must affirm the decision." *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).

## IV.   DISCUSSION

Plaintiff's sole argument in her appeal is that the ALJ failed to properly evaluate her treating physical therapist Nierengarten's opinions in accordance with 20 C.F.R. § 404.1520c.  (Dkt. 19 at 11-20.)

"A disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'"  *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'"  *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).  However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).  Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his

27

limitations." *Id.* (quoting *Myers*, 721 F.3d at 527). "It is the function of the ALJ to weigh conflicting evidence. We will not reverse merely because evidence also points to an alternate outcome." *Dols v. Saul*, 931 F.3d 741, 749 (8th Cir. 2019) (quotation marks and citations omitted).

Plaintiff contends that the ALJ completely failed to address the mandatory supportability factor when evaluating Nierengarten's opinions. (Dkt. 19 at 13.) According to Plaintiff, the ALJ's finding that Nierengarten's opinions were not supported by the overall record is not the appropriate standard to apply under 20 C.F.R. § 404.1520c. (Dkt. 19 at 13.) Plaintiff goes on to argue as follows:

> The supportability factor reviews the relevant medical evidence and supporting explanations presented by the medical source used in support of their own opinion. 20 C.F.R. § 404.1520c(c)(1). Here, the ALJ did not address Ms. Nierengarten's notes at all and thus completely failed to address one of the two mandatory factors.

(*Id.*)

In addition, Plaintiff asserts that the ALJ failed to properly evaluate the consistency factor, which she asserts measures how consistent a medical opinion is with the evidence from other medical sources in the claim, because the ALJ only pointed to "a couple of cherry picked pieces of evidence" to support the decision and the decision is not based on substantial evidence. (*Id.* at 14-18.)

Defendant counters as follows:

> It is true that the ALJ's decision does not include a detailed discussion of the medical evidence Ms. Nierengarten cited in support of her opinion, but that is because Ms. Nierengarten's checklist did not actually provide any such medical evidence. On five different occasions, the form she completed asked her to explain what "medical findings" supported her conclusions. Her

answers to these questions were conclusory at best, generally unresponsive, and did not provide any supportive evidence that the ALJ could have meaningfully discussed in the written opinion.

(Dkt. 22 at 16.)  As such, Defendant argues that the checklist responses which Plaintiff now argues the ALJ had a duty to discuss in terms of the supportive evidence contained within, instead contained only diagnoses and conclusions, all of which the ALJ did discuss in his written decision.  (*Id.* at 17.)  Defendant asserts that while Plaintiff seeks to confine the Court's attention to what she calls "the ALJ's rather cursory analysis" of the checklist in question, the Court may look to the entire written decision to assess whether an opinion's supportability and consistency has been sufficiently analyzed.  (*Id.* at 18.) The Commissioner further argues that Plaintiff's claim that the RFC did not contain a wheelchair limitation ignores the fact that the ALJ asked the VE whether the occupations identified at the hearing could be performed by someone confined to a wheelchair, to which the VE replied that he or she could, and that any failure with respect to the ALJ's analysis under 20 C.F.R. § 404.1520c constitutes harmless error given that the ALJ's finding are supported by substantial evidence.  (*Id.* at 19-20.)

The Court considers the ALJ's treatment of Nierengarten's opinions when determining the RFC.[11]  Because Plaintiff's claim was filed after March 27, 2017, the applicable regulation is 20 C.F.R. § 404.1520c.  *See Pa M. v. Kijakazi*, No. CV 20-741 (BRT), 2021 WL 3726477, at *6 n.7 (D. Minn. Aug. 23, 2021) ("Since Plaintiff's claim

---

[11]    The parties appear to agree that an Occupational Therapist is a "medical source" whose opinion constitutes a "medical opinion", which required an analysis under 20 C.F.R. § 404.1520c(b), as to its supportability and consistency with the record.

was filed after March 27, 2017, § 404.1527 does not apply because § 404.1520c

supersedes any previous statutory requirements.") (citing 20 C.F.R. § 404.1520c).

Pursuant to § 404.1520c:

> [An ALJ] will not defer or give any specific evidentiary weight, including
> controlling weight, to any medical opinion(s) or prior administrative medical
> finding(s), including those from [a claimant's] medical sources.  When a
> medical source provides one or more medical opinions or prior
> administrative medical findings, [the ALJ] will consider those medical
> opinions or prior administrative medical findings from that medical source
> together using the factors listed in paragraphs (c)(1) through (c)(5) of this
> section, as appropriate.  The most important factors [an ALJ] consider[s]
> when [the ALJ] evaluate[s] the persuasiveness of medical opinions and prior
> administrative medical findings are supportability (paragraph (c)(1) of this
> section) and consistency (paragraph (c)(2) of this section).

20 C.F.R. § 404.1520c(a).  Those factors include "the supportability and consistency of

medical opinions and may consider the relationship with the claimant, specialization, and

other factors."  *Pa M.*, 2021 WL 3726477, at *6 (citations omitted).  According the

SSA's regulations:

> The factors of supportability (paragraph (c)(1) of this section) and
> consistency (paragraph (c)(2) of this section) are the most important factors
> we consider when we determine how persuasive we find a medical source's
> medical opinions or prior administrative medical findings to be.  Therefore,
> we will explain how we considered the supportability and consistency factors
> for a medical source's medical opinions or prior administrative medical
> findings in your determination or decision.  We may, but are not required to,
> explain how we considered the factors in paragraphs (c)(3) through (c)(5) of
> this section, as appropriate, when we articulate how we consider medical
> opinions and prior administrative medical findings in your case record.

20 C.F.R. § 404.1520c(b)(2).  As such, an "ALJ must explain how those two factors were

considered in determining the persuasiveness of a medical opinion."  *Jane D. v. Kijakazi*,

No. 20-CV-1278-MJD-KMM, 2021 WL 5360450, at *5 (D. Minn. Oct. 26, 2021), *R. &*

*R. adopted*, 2021 WL 5358569 (D. Minn. Nov. 17, 2021) (citation omitted).  The SSA has described supportability and consistency as follows:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(1)-(2).

"Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation."  Revisions to Rules, 82 Fed. Reg. at 5853, 2017 WL 168819 (Jan. 18, 2017); *see also* 20 C.F.R. § 404.1520c(c)(1).  "An ALJ's discussion of [a medical source's] treatment and examination notes reflects the ALJ's consideration of the supportability factor with respect to their opinions."  *Stephanie B. v. Kijakazi*, No. CV 22-837 (JWB/DTS), 2023 WL 3394594, at *1 (D. Minn. May 11, 2023) (citation omitted); *Troy L. M. v. Kijakazi*, No. 21-CV-199 (TNL), 2022 WL 4540107, at *11 (D. Minn. Sept. 28, 2022) (addressing the consistency of the medical source's treatment records with the opinion provided as to functioning in conjunction to supportability).  "Consistency" denotes "the extent to which the opinion is consistent with the evidence

from other medical sources and nonmedical sources in the claim."[12] Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

An "ALJ is not required to explain the remaining factors unless the ALJ 'find[s] that two or more medical opinions . . . about the same issue are both equally well supported . . . and consistent with the record . . . but are not exactly the same.'" *Jane D.*, 2021 WL 5360450, at *5 (quoting 20 C.F.R. § 404.1520c(b)(2)-(3)).

With respect to Nierengarten's medical source statement dated February 17, 2021, the ALJ's evaluation of this opinion was as follows:

> Kristin Nierengarten, OTR, the claimant's physical therapist, offered a medical source statement dated February 17, 2021 (Ex. 11F). In this medical source statement, Ms. Nierengarten opined [that] the claimant was limited to lifting and carrying less than 10 pounds; standing and walking less than 2 hours in an 8-hour work day; sitting about 2 hours in an 8-hour work day; could sit for 45 [minutes] before needing to change positions; would need to shift from sitting or standing/walking at will; would need to lie down intermittently throughout an 8-hour work day; would need to elevate her feet/legs during a work shift; could never crouch, climb stairs or ladders, and operate foot controls; could occasionally twist and stoop from a sitting position only, and rotate or flex the neck; could frequently remain in static neck position; could occasionally handle and finger from a sitting position only; could have no exposure to extreme cold, extreme heat, and hazards; could have no concentrated exposure to wetness, humidity, vibration, and fumes, odors, dusts, gases, and poor ventilation; and would be absent more than 3 times a month. Ms. Nierengarten indicated the claimant is dependent on a wheelchair and requires extensive assistance for transfers. Ms. Nierengarten indicated these limitations dated to April 2020.
>
> Ms. Nierengarten's opinion as to the claimant's physical limitations is not persuasive, as it is not supported by or consistent with the overall record, including the lack of spinal myelopathy or imaging, the lack of an obesity

---

[12]    The Court notes the fact that the "consistency" factor considers whether "the opinion is consistent with the evidence from **<u>other medical sources</u>**" further supports the interpretation that the "supportability" factor must take into account whether the opinions are consistent with the medical source's treatment record for Plaintiff.

diagnosis, the good heart function, no pulmonary testing, and the lack of neurological evidence to support stroke or central nervous impairment. As discussed above and noted by the state agency medical consultants, EMG testing is normal, no atrophy or radiculopathy is noted, overall normal strength is noted, and inflammatory arthritis was ruled out (See, e.g., Ex. 10F/6; 15F/3, 13-14, 16). I do not find that the record supports the 4-hour limitation, as Ms. Nierengarten opined. I also do not include a wheelchair in the residual functional capacity. Thus, I find not persuasive Ms. Nierengarten's opinion.

(R. 23-24.)

The Court finds that the ALJ committed legal error with respect to his analysis of the supportability factor. The Court makes this finding on the basis that the ALJ failed to address whether Nierengarten's opinions and the reasoning behind those limitations, even if conclusory as argued by Defendant, were consistent with Nierengarten's examinations of and findings related to Plaintiff as set forth in the medical record before the ALJ. (*See*, *e.g.*, R. 1631-35, 1843-47, 2060-61.) Given this omission, the Court cannot conclude that the supportability factor was properly addressed by the ALJ. *See Jacqueline C. v. Kijakazi*, No. CV 21-1612 (JRT/TNL), 2022 WL 4463902, at *8 (D. Minn. Sept. 26, 2022) ("The ALJ pointed to portions of Kahler's findings that the ALJ considered to be contradictory with other findings Kahler made. The ALJ noted several pieces of evidence on the record from near the time of Kahler's assessment that are inconsistent with his opinion. In other words, the ALJ explicitly addressed evidence that undermined the supportability and consistency of Kahler's opinion.").

In addition, there is no indication that the ALJ adequately considered evidence of Plaintiff's functioning in the remaining medical record with respect to consistency, including but not limited to, the extensive physical therapy notes (*see*, *e.g.*, R. 1602,

1621, 1615-16, 1840, 1843-46, 1856-58, 1885-88, 2021, 2063, 2070-71, 2074, 2126-31

2142, 2178, 2180-81, 2236-37, 2251, 2268, 2293, 2313), as it appears that the ALJ was

focused **primarily** on objective imaging, EMG, and immunology medical test results,

without considering the remining medical evidence.[13] The new articulation requirements

---

[13]    The Court also notes that it appears that the ALJ relied on Ex. 10F/6; 15F/3, 13-14, 16 as evidence that Nierengarten's limitations are not consistent with the overall record.  Exhibit 10F/6 is part of an October 14, 2020 treatment note from Dr. Jeffery Allen, M.D.  (R. 1915, 1917.)  The Court acknowledges that a portion of this medical record does set forth that the imaging and EMG studies from April 2020 through August 2020 could not account for Plaintiff's symptomology.  (R. 1916.)  However, the ALJ's reliance on these records ignores that Plaintiff's physical examination in these records showed weakness and decreased sensation in her lower extremities (R. 1917), which contradicts the ALJ's assertion of a showing of normal strength (R. 17, R. 23), and the exam note relied on by the ALJ for the fact that Plaintiff was "[a]ble to stand unassisted pushing off of wheelchair" (R. 20) stated in the next sentence: "**Requiring assist of one to walk.  Unable to fully lift feet off the ground with walking.  She was able to lift the heel but the toe would drag on the ground**" (R. 1917 (emphasis added)).  In other words, the same documents that the ALJ relied upon to discount the supportability and consistency of Nierengarten's limitations for Plaintiff contain examination findings that actually support Neirengarten's limitations (outside of the actual laboratory and imaging findings).  Exhibits 15F/3, 13-14 and 16, relied on by the ALJ, are Dr. Jeffery Allen's November 18, 2020 and March 17, 2021 treatment notes for Plaintiff (including the Nerve Conduction & EMG Report).  (R. 2180, 2188-2193.)  These records show that the most recent EMG was largely normal, **although** there was a "suprasegmental (central) recruitment pattern," which "is not seen in lower motor neuron disorders, but rather indicates limitation by pain, effort, or upper motor neuron disease."  (R. 2191, 2192.)  In addition, this record supports decreased strength and sensation in the lower extremities, and Plaintiff's inability to walk on her own.  (R. 2180.)  Moreover, Dr. Allen acknowledged that there "remains a discrepancy between objective data and her degree of impairment."  (R. 2191.)  This included needing a minimal assist to get up from a seated position but being unable to lift a leg upon formal testing, and only taking "short cautious deliberate steps."  (R. 2190.)  In sum, it appears that the ALJ was engaged in cherry-picking within the very documents he was relying upon.  *See Thesing v. Colvin*, No. CIV. 13-1079 JRT/JSM, 2014 WL 3890372, at *26 (D. Minn. Aug. 8, 2014) (quoting *Denton v. Astrue*, 596 F.3d 419, 426 (7th Cir. 2010) (citation omitted)) ("'An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.'").

under 20 C.F.R. § 404.1520c are meant to "provide individuals with a better understanding of [the Commissioner's] determinations and decisions" and "provide sufficient rationale for a reviewing adjudicator or court."  Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, at 5854, 5858 (Jan. 18, 2017).  The problem with the ALJ's analysis is that it appears he only considered objective test results to the exclusion of the remainder of the medical record.  Ultimately, the Court finds that the ALJ failed to provide the Court with a sufficient rationale for its review.

The Court also rejects the Commissioner's argument that the Court must look at the entire written decision by the ALJ to assess whether an opinion's supportability and consistency has been sufficiently analyzed.  (Dkt. 22 at 18.)  Several courts have concluded that the regulation cannot be satisfied simply because a court can review the entirety of an ALJ's decision and recitation of the facts to craft a post-hoc rationale for the ALJ.  *See*, *e.g.*, *Bonnett v. Kijakazi*, 859 F. App'x 19, 20 (8th Cir. 2021) ("While the Commissioner argues that Dr. Thompson's opinion was not consistent with specific other evidence in the record, we will not affirm on this basis, as the ALJ made no such findings."); *Susan H. v. Kijakazi*, No. 21-cv-2688 (ECT/ECW), 2023 WL 2142786, at *3 (D. Minn. Feb. 21, 2023) (sustaining plaintiff's objection that magistrate judge made "'post hoc rationalizations' to explain the ALJ's decision" and remanding because "[t]he ALJ's failure to 'explain how she considered the supportability and consistency factors for a medical source's medical opinions' is legal error") (cleaned up); *Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 908 (E.D. Mich. 2021) (sustaining plaintiff's objection to report and recommendation where "[b]oth the Commissioner [in the summary

judgment brief] and the magistrate judge described other evidence in the administrative record that could furnish substantial evidence for a nondisability finding and support for rejecting the physicians' opinions" because this approach "ignores the mandate of the regulations that guarantees claimants a certain level of process that cannot be discounted by the substantial evidence test alone").

Similarly, Defendant's harmless error argument is of no avail. "The ALJ's failure to explain how [he] considered the supportability and consistency factors for a medical source's medical opinions is legal error." *Susan H.*, 2023 WL 2142786, at *3 (marks and citations omitted); *see also Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021) (finding that the Commissioner's decision will be affirmed if it is supported by substantial evidence in the record as whole **and** the ALJ made no legal error). "Even if the Court were to agree that substantial evidence supports the ALJ's weighing of each of [Nierengarten's] opinions, substantial evidence alone does not excuse non-compliance with the regulations as harmless error." *Hardy*, 554 F. Supp. 3d at 908 (cleaned up) (marks and citation omitted). "Courts in this District, the Eighth Circuit, and elsewhere have similarly concluded that the failure to address or adequately explain either the supportability or consistency factors (or both) when evaluating the persuasiveness of a medical opinion warrants remand." *Violet G. v. Kijakazi*, No. 21-CV-2105 (TNL), 2023 WL 2696594, at *6 (D. Minn. Mar. 29, 2023) (collecting cases).

On remand, the ALJ shall reconsider Nierengarten's February 17, 2021 opinion. If the ALJ finds that Nierengarten's opinions are unpersuasive, the ALJ shall articulate the reasons therefor, fully addressing the supportability and consistency factors as well as

any other relevant factors, "so a reviewing court can make a meaningful assessment of a challenge to [the] ALJ's evaluation of the persuasiveness of . . . [the] medical opinion[ ]." *Hirner v. Saul*, No. 2:21-CV-38 SRW, 2022 WL 3153720 ay *9 (E.D. Mo. Aug. 8, 2022). This includes whether Nierengarten's opinions were consistent with Nierengarten's examinations and findings related to Plaintiff as set forth in the medical record before the Commissioner. The ALJ is to fully consider the medical record with respect to the consistency factor, including but not limited to physical therapy records., as opposed to limiting the decision's bases to imaging and other laboratory findings. *See Hewett v. Astrue*, 2010 WL 940982, *11 (N.D. Fla. March 12, 2010) (concluding "the lack of objective medical test results confirming an organic cause of Plaintiff's migraine or tension headaches, and the fact [the doctor] had only Plaintiff's subjective report of symptoms upon which to base his assessment, is not an adequate reason to disregard [the doctor's] opinion"). In reassessing these factors, the ALJ may include any evidence that he feels is pertinent to supportability and consistency.

## V.     RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.     Plaintiff's Motion for Summary Judgment (Dkt. 18) be **GRANTED** in part and **DENIED** in part;

2.     Defendant Commissioner Defendant Acting Commissioner of Social Security Kilolo Kijakazi's Motion for Summary Judgment (Dkt. 21) be **DENIED**; and

3.     This case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Report and Recommendation.

DATED: June 27, 2023                          *s/Elizabeth Cowan Wright*
                                              ELIZABETH COWAN WRIGHT
                                              United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).